UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JIMMY L. HEARD,               )
                              )
          Plaintiff,          )
                              )
     v.                       )    Case No. 2:10CV77 FRB
                              )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                              )
          Defendant.          )

## MEMORANDUM AND ORDER

This matter is on appeal for review of an adverse ruling by the Social Security Administration.   All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I.   Procedural Background

On November 6, 2008, plaintiff Jimmy L. Heard ("Plaintiff") filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging disability as of August 12, 2008.  (Administrative Transcript ("Tr.") at 92-103).   Plaintiff's applications were initially denied, (Tr. 49-55), and he requested a hearing before an administrative law judge ("ALJ").  (Tr. 58-59).  On May 6, 2010, an administrative hearing was held before ALJ Lance K. Hiltbrand, (Tr. 19-47), and on May 27, 2010, ALJ Hiltbrand issued his decision denying Plaintiff's applications for benefits.   (Tr. 5-15). Plaintiff sought review from Defendant Agency's Appeals Council,

-1-

(Tr. 4), which denied Plaintiff's request for review.  (Tr. 1-3).
The ALJ's decision thus stands as the Commissioner's final
decision.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

During his administrative hearing, Plaintiff was
represented by counsel and testified on his own behalf.  Plaintiff
testified that he was born on January 31, 1967, and was currently
43 years of age; had never been married; had attended school
through the eleventh grade and had attended special education
classes; and presently lived in a home in Moberly, Missouri with
his mother and step-father.  (Tr. 23-27).  He stated that he had
never had a driver's license and had in fact never applied for one
because he had been a heavy drinker.  (Tr. 33-34, 39).  Plaintiff
testified that he was the father of two children, aged 19 and 23,
and had one grandchild.  (Tr. 26).  He stated that he saw his
children on a regular basis.  (<u>Id.</u>)

Plaintiff testified that his last employer was Mabel
Dean's Restaurant, where he worked for about three months as a
dishwasher.  (Tr. 28-29).  He stated that he had also previously
worked in a factory stacking paper supplies.  (Tr. 30).  Plaintiff
testified that he lifted and stacked boxes full of bottles of dish
liquid.  (Tr. 42).  He also testified that he was able to lift his
three-year-old grandchild.  (Tr. 42-43).  Plaintiff stated that he
was unable to work because he was a "slow learner."  (Tr. 29).

Plaintiff testified that he started drinking alcohol at

age 13, and had recently completed a 21-day alcohol treatment program. (Tr. 30). Plaintiff testified that he had never used marijuana, cocaine, crack, or methamphetamine. (Id.) Plaintiff testified that he had served time in prison for statutory rape, (Tr. 30-31), and was registered as a sex offender. (Tr. 30-31, 35).

Plaintiff testified that he generally went to bed at midnight or 1:00 a.m., and slept until about noon or 1:00 p.m. (Tr. 32). He stated that he was able to attend to his own personal hygiene, dress himself, and help with household chores. (Tr. 32-33). Plaintiff testified that he had a girlfriend named Sharon who drove to his house from Columbia, Missouri to pick him up and take him to her house. (Tr. 33).

Plaintiff denied having any problems with lifting or walking. (Tr. 34). Plaintiff stated that, when working in the past, he had trouble operating the machinery, and needed to be reminded many times until he got "the hang of it." (Tr. 35). He stated that he had been "laid off" from jobs, and that, on these occasions, his employer would call his girlfriend and explain to her the reason for the termination. (Tr. 36). He stated that when he was employed as a dishwasher, his employer would let him work in an area where dishes were washed by hand instead of requiring him to operate the machines. (Id.) When asked whether he could read, Plaintiff replied, "No, not really." (Tr. 37). He stated that he tried to write and was able to write some letters, but needed help with spelling. (Id.) He stated that he was not good at math.

-3-

(Id.)

Regarding his past jobs, Plaintiff testified that he sometimes had assistance from co-workers who showed him where things were and what needed to be done. (Tr. 38). He stated that he got through the eleventh grade because the teachers were "just there for a check" and pushed students through even if they had learned nothing. (Tr. 39-40). Plaintiff testified that other members of his family were slow learners. (Tr. 40). He stated that he had trouble staying on track, and became frustrated. (Tr. 40-41).

The ALJ then heard testimony from John McGowan, a Vocational Expert (also "VE"). The VE noted that Plaintiff worked from 2001 through 2004, earning $10,000.00 to $13,000.00 as a dishwasher, which is classified by the Dictionary of Occupational Titles (also "DOT") as unskilled work at the medium exertional level. (Tr. 43). The VE characterized Plaintiff's factory work as production assembly, which is classified in the DOT as unskilled work at the light or medium exertional level. (Id.) In response to a hypothetical posed by the ALJ that included moderate deficiencies as to daily living activities and the ability to maintain concentration, persistence and pace; mild limitations on the ability to maintain social functioning; and the ability to adapt to a work situation, understand, remember and carry out short simple instructions, and interact appropriately with others, the VE testified that such an individual could perform Plaintiff's past relevant work. (Tr. 44-45).

-4-

B. <u>Evidence of Record</u>

Records from the Columbia, Missouri Public Schools, New Madrid RI High School, show that, in 1983, Plaintiff was administered the WISC-R IQ test and achieved verbal and reading scores of 54, and a full-scale IQ score of 50. (Tr. 117).

An Individualized Education Program designed for Plaintiff indicated that he spent half of his school week in a special education classes, and that he spent the other half of his school week in Regular Education classes. (Tr. 120). It is also indicated that Plaintiff did not require modifications to his Regular Education classes. (<u>Id.</u>) It is indicated that Plaintiff showed weakness in reading skills, and a lack of knowledge of his environment. (<u>Id.</u>)

On February 27, 2007, Plaintiff's probation officer referred him to the Hannibal Council on Alcohol and Drug Abuse (also "HCADA") due to his continued use of alcohol while on probation. (Tr. 207). Plaintiff was discharged on May 14, 2007 with an "unsuccessful" designation. (Tr. 207).

On November 4, 2008, a Function Report was completed on Plaintiff's behalf by a person who is listed as Plaintiff's fiancee. (Tr. 146-54). Therein, it is indicated that Plaintiff spends his waking hours doing such things as cleaning house, ironing clothes, showering, dressing and attending to hygiene, and watching television. (Tr. 146). Plaintiff takes care of two fish, which involves cleaning their bowls and feeding them. (Tr. 147). It is indicated that there is nothing that Plaintiff was able to do

before that he is now unable to do. (Id.) It is indicated that Plaintiff is able to attend to all aspects of his personal care, and needs no reminders to do so. (Tr. 147-48). It is indicated that Plaintiff prepares his own meals consisting of sandwiches, chicken, pork chops, and so forth. (Tr. 148). It is indicated that, every day, Plaintiff spends about five hours doing house and yard work such as cleaning, doing laundry, ironing, and mowing, and that he did not need any help or encouragement to do so. (Id.) It is indicated that Plaintiff goes out every day, and either walks, rides a bicycle, or gets a ride with others, (Tr. 149), and goes places such as to a friend's house, to "classes" and to his probation officer's office. (Tr. 150). It is indicated that Plaintiff can shop for food, clothes, shoes, and household products, and that he does so "every so often" for about an hour. (Tr. 149). It is indicated that Plaintiff can pay bills and count change, but could not balance a checkbook or savings account. (Id.) It is indicated that Plaintiff's ability to handle money had not changed since his alleged onset date. (Tr. 150). It is indicated that Plaintiff needed reminders to go places, but did not need anyone to accompany him and did not have any problems getting along with anyone. (Id.) It is indicated that Plaintiff's condition affects his ability to understand, talk, follow instructions, complete tasks, remember, and concentrate. (Tr. 151). It is explained that Plaintiff could understand "to a certain point" and that he spoke with a lisp, and could not concentrate on anything other than what he knew. (Id.) It is

-6-

indicated that Plaintiff could pay attention for a short term, that
he got along well with authority figures, and was able to handle
changes in routine, but that he did not follow written or spoken
instructions well.  (Tr. 151-52).  It is indicated that Plaintiff
spends "a couple of hours" playing video games, doing puzzles, and
using a computer.  (Tr. 162).

On November 10, 2008, Plaintiff's probation officer
referred him again to HCADA, this time due to urinalysis results
that were positive for marijuana.  (Tr. 209, 211).  Plaintiff
reported that he was unemployed and having trouble finding a job.
(Tr. 211).  Plaintiff reported that his last intentional use of
marijuana was eight or nine months ago, and that the current
positive urinalysis resulted from eating cookies that, unbeknownst
to him, contained marijuana.  (Id.)  An "Addiction Severity Index"
was completed, in which Plaintiff's major substance abuse problem
was identified as marijuana.  (Tr. 214).  It was also indicated
that Plaintiff had used marijuana for 23 years, and had used
alcohol to the point of intoxication for 25 years.  (Id.)  It is
further indicated that Plaintiff had used more than one substance
per day, including alcohol, for 23 years.  (Id.)

It is indicated that Plaintiff had close, long-lasting
personal relationships with his mother, siblings, partner, and
children, and that he spent most of his free time with his friends.
(Tr. 217).  Plaintiff indicated that there were no significant
periods of time in which he experienced serious problems with his
mother, siblings, partner, children, other family members, close

-7-

friends, neighbors, or co-workers.  (Id.) Plaintiff indicated that he experienced comprehension/memory problems, but the examiner indicated that Plaintiff did not have problems with his comprehension, concentration, or memory during the interview.  (Tr. 218).  Plaintiff was discharged from HCADA on February 11, 2009 with a "successful" designation.  (Tr. 209).  It is indicated that Plaintiff's overall progress through treatment was good, as evidenced by positive participation in group, attendance at all scheduled individual sessions, and negative urinalysis results. (Id.) Plaintiff's prognosis was indicated as "good," provided that he followed his plan for continued personal recovery.  (Id.)

On December 31, 2008, at the request of Disability Determination services, a consultative examination was performed by John Keough, M.A., a licensed psychologist.[1]  (Tr. 188-90).  When asked how he was disabled mentally, Plaintiff replied, "I can't read big words.  I can't comprehend and my memory is so so."  (Tr. 188).  Plaintiff reported experiencing depression, and stated that he had no hope and had felt worthless and depressed since childhood.  (Id.) Plaintiff also reported feeling frustration, but not anger, and stated that he got along with other people.  (Id.) He stated that he could not sleep at night, and instead went to sleep at 6:00 a.m. and slept for three hours.  (Id.) He denied ever having mental health treatment.  (Tr. 188).  Plaintiff indicated that his developmental stages were slow, and that his

---

[1]Mr. Keough was instructed to perform a WAIS-III/IV if Plaintiff appeared to need testing performed.  (Tr. 191).

father had been verbally abusive. (Id.) He stated that his parents had not been married, and that as a child he had little contact with them and was raised by his maternal grandparents, but that he now maintained contact with his mother. (Id.)

He reported that he dropped out of school in the eleventh grade because his family was always moving around. (Id.) He did not get a G.E.D. (Tr. 188). Plaintiff reported first being employed at age 13; that he last worked in August of 2008; and had held jobs as a dishwasher and meal preparer. (Id.) Plaintiff stated that he had never been married but had a son and daughter, and that he was living with his girlfriend of two years and his son. (Id.)

Plaintiff reported that he did not have a social life, and instead sat around the house, did maintenance work, and watched movies on television. (Id.) He stated that he first used alcohol at age 13 and had a problem with it until last year. (Tr. 188). He denied ever using any other street drugs. (Id.) Plaintiff stated that he smoked one to two packs of cigarettes per day. (Id.) He stated that, at age 17, he was convicted of statutory rape and spent five years in prison, and was presently on parole after being convicted of residing too close to a school. (Id.)

Plaintiff described his physical well-being as good, stating that he had a "good" general attitude and described his future as "[s]ometimes bad and sometimes good." (Tr. 188). He said he had two or three good days per week. (Id.)

Upon mental status examination, Mr. Keough found that

Plaintiff had no difficulty in following the context of the interview, and that he was able to understand and follow simple instructions. (Tr. 189). Plaintiff was clean, appropriately dressed, and exhibited adequate personal hygiene. (Id.) Mr. Keough wrote, "[o]ther than slow response time, there were no unusual gestures or mannerisms. [Plaintiff] appeared to have no difficulty interacting with the consultant, although indications are he was doing so in a superficial manner and overemphasizing symptomology." (Id.) Mr. Keough noted that Plaintiff appeared to be experiencing a mild to moderate level of depression, and that Plaintiff's affective responses were inconsistent with his reported level of depression. (Id.) Mr. Keough found Plaintiff's speech to be relevant and goal directed, and discerned no evidence of loose thought associations. (Tr. 189). Plaintiff was oriented, and had no difficulty reciting his date of birth and his social security number. (Id.)

Mr. Keough opined that, intellectually, Plaintiff functioned in the Extremely Low Range. (Id.) He noted that Plaintiff's performance skills were not measured during the interview. (Id.) Mr. Keough opined that Plaintiff's memory functioning appeared to be adequate, as Plaintiff related his history in a sequential manner, was able to recall significant life events, and was able to perform memory tests in a satisfactory manner. (Tr. 189).

Plaintiff reported that he rose in the afternoon, tried to get himself together, walked around if it was nice outside,

watched television, napped, and retired by 2:00 a.m.  (Id.)  When
Mr. Keough asked Plaintiff what kept him from doing what he wanted
to do, Plaintiff replied, "Mostly comprehending and spelling."
(Id.)  When asked what kept him from working 40 hours a week for a
year, Plaintiff replied, "Mostly, I don't have an up-to-date ID and
most jobs want an ID."  (Id.)  Plaintiff reported that he was able
to manage money a little bit.  (Tr. 189).

Mr. Keough opined that Plaintiff's ability to understand
and remember instructions, on a sustained basis, necessary to make
routine work-related decisions without supervision, was somewhere
between the simple to moderate level of complexity, as long as
Plaintiff was not using alcohol or other street drugs.  (Id.)  Mr.
Keough opined that Plaintiff's ability to sustain concentration, be
persistent in tasks, and maintain an adequate pace in productive
activity to the extent necessary to be gainfully employed working
40 hours a week for at least one year in a mainstream work
environment would be adequate in a low stress, low demand
environment.  (Id.)  Mr. Keough opined that Plaintiff's ability to
adapt to the environment of others, respond appropriately to
supervision in a work setting, adjust to changes in routine and
interact socially in an appropriate manner appeared to be
moderately limited by a mood disorder, impulse-control issues,
personality deficits and a long history of substance
abuse/dependence.  (Tr. 189-90).  Mr. Keough diagnosed Plaintiff
with a mood disorder, impulse-control disorder, alcohol dependence
in partial remission, and personality disorder.  (Tr. 190).  Mr.

Keough opined that there were indications that Plaintiff's full-scale IQ was below 70.  (<u>Id.</u>)

On February 4, 2009, Mark Altomari, Ph.D., completed a Psychiatric Review Technique form.  (Tr. 192-202).  Dr. Altomari noted Plaintiff's 1983 IQ test, his history of mood disorder, personality disorder and impulse control disorder, and his history of alcohol dependence in remission.  (Tr. 202).  Dr. Altomari concluded that Plaintiff had moderate restrictions in terms of activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace; and mild difficulties in maintaining social functioning.  (Tr. 200).  Dr. Altomari noted Mr. Keough's observation that Plaintiff had no difficulty following the context of the interview and was able to understand and follow simple instructions; that Plaintiff did not present himself as a person experiencing severe depression; and that Plaintiff had an intact memory and appeared to be functioning in the extremely low range of intellectual functioning. (Tr. 202).  Dr. Altomari noted that Plaintiff's employment history produced years of earnings at the substantial gainful activity level, and that Plaintiff was able to prepare simple meals, perform household chores, count change and pay bills.  (<u>Id.</u>)  Dr. Altomari discussed Plaintiff's prior IQ test, but concluded that "IQ testing at this time would not be productive in view of the functional history, as he functions higher than he tests."  (<u>Id.</u>)  Dr. Altomari concluded that Plaintiff had a severe impairment that did not meet a listing. (<u>Id.</u>)

Dr. Altomari completed a Mental Residual Functional Capacity Assessment wherein he opined that Plaintiff was "Moderately Limited" in terms of his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. (Tr. 204-05). Dr. Altomari opined that Plaintiff was "Not Significantly Limited" in all other areas, and assessed no marked limitations. (Id.)

### III.    The ALJ's Decision

The ALJ determined that Plaintiff had the severe impairments of organic mental disorders, mental retardation, personality disorder, and history of substance addiction disorder. (Tr. 10).  The ALJ discussed the evidence of record concerning Plaintiff's mental functioning and his functional abilities and limitations, and concluded that Plaintiff's impairments did not meet or medically equal a listed impairment.  (Tr. 10-14). Specifically, the ALJ determined that Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.02, 12.05, 12.08, and 12.09.  (Tr. 10-14).

The ALJ concluded that Plaintiff retained the residual functional capacity (also "RFC") to occasionally lift/carry 50 pounds and frequently lift/carry 25; walk/stand and sit for about six hours in an eight-hour day; understand, remember and carry out short simple instructions; interact appropriately with others, co-workers, and supervisors; and adapt to a work situation. (Tr. 13).

-13-

The ALJ determined that Plaintiff had moderate restrictions of activities of daily living, mild difficulties in maintaining social functioning; and moderate deficiencies of concentration, persistence, or pace. (Id.) The ALJ concluded that Plaintiff was capable of returning to his past relevant work as a dishwasher and product assembler. (Tr. 14). In so finding, the ALJ discussed all of the evidence of record, including the opinions of Mr. Keough and Dr. Altomari, stating that he was giving Altomari's opinion great weight. (Tr. 10-14). The ALJ concluded that Plaintiff had not been under a disability as defined by the Act from August 12, 2008 through the date of the decision. (Tr. 15).

In the case at bar, Plaintiff challenges only the ALJ's determination that Plaintiff failed to meet or equal the criteria for disability under 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(B) or (C). In support, Plaintiff argues that the results of his IQ test at age sixteen satisfy the § 12.05 criteria, and argues that the ALJ had no justifiable reason for concluding that the record did not contain a valid IQ test. Plaintiff challenges the ALJ's determination that Plaintiff's daily activities and his ability to work in the past were inconsistent with disability due to mental retardation.

Plaintiff also argues that, even if the ALJ could properly invalidate his IQ testing from age sixteen, it would be "easy to assume the Plaintiff still had mild mental retardation levels" inasmuch as Mr. Keough wrote that Plaintiff had low levels of functioning and estimated that his IQ would fall below 70, and

-14-

that Plaintiff would therefore fall within the range specified by § 12.05(C).  (Id. at 8).  Plaintiff states that the ALJ had no justifiable reason for rejecting "Dr. Keough's opinion regarding the Plaintiff's mental retardation" and also states that the ALJ improperly disregarded Mr. Keough's estimate of Plaintiff's IQ. (Id.)

Plaintiff also suggests that the ALJ failed to fully develop the record, stating that the ALJ should have done so if he felt the record needed more information.  Citing to the administrative transcript, Plaintiff contends that, although his attorney requested updated IQ testing, no such testing was performed.

Plaintiff also claims that the ALJ gave great weight to the opinion of the "state agency medical consultant" without first considering the factors in 20 C.F.R. §§ 404.1527 and 416.927; and states that the ALJ failed to mention the weight given to the "consultative mental psychologist."  (Docket No. 20 at 7-8).

Plaintiff argues that this is "a listing case" and that the issue is whether he meets a listing, not whether he can actually perform his past work or any other work, and argues that the ALJ "blurred the two inquiries by maintaining that the Plaintiff cannot be found disabled because he worked in the past with his mental retardation and functioned 'higher than he tests'". (Id. at 11).  In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

-15-

**IV.    Discussion**

          To be eligible for Social Security Disability Insurance
Benefits and Supplemental Security Income under the Social Security
Act, plaintiff must prove that he is disabled.  Pearsall v.
Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary
of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The
Social Security Act defines disability as the "inability to engage
in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months."   42 U.S.C. §§
423(d)(1)(A), 1382c(a)(3)(A).   An individual will be declared
disabled "only if his physical or mental impairment or impairments
are of such severity that he is not only unable to do his previous
work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work
which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B).

          To determine whether a claimant is disabled, the
Commissioner engages in a five-step evaluation process.  See 20
C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42
(1987).  The Commissioner begins by deciding whether the claimant
is engaged in substantial gainful activity.  If the claimant is
working, disability benefits are denied.  Next, the Commissioner
decides whether the claimant has a "severe" impairment or
combination of impairments, meaning that which significantly limits

-16-

his ability to do basic work activities.  If the claimant's impairments are not severe, then he is not disabled.  The Commissioner then determines whether the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If so, the claimant is conclusively disabled and the sequential evaluation process ceases.  If not, the Commissioner continues to the fourth step and determines whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test" is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).  In conducting its inquiry, this Court considers evidence that detracts from the Commissioner's

-17-

decision as well as evidence that supports it.  Porch v. Chater, 115 F.3d 567, 571 (8th Cir. 1997).  However, if the record contains substantial evidence supporting the Commissioner's decision, that decision must be affirmed even if the record could have also supported the opposite decision.  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

A.   Listing 12.05 (Mental retardation)

"To qualify for disability under a listing, a claimant carries the burden of establishing that his condition meets or equals all specified medical criteria." McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (citing Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir. 1995)).  A claimant will not be deemed to meet a listing merely because he has a diagnosis of a condition named therein and meets some of the criteria.  Id. at 612; see also Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify").  While an ALJ is required to consider evidence of listed impairments and determine whether they meet or are equivalent to any of the listed impairments, "[t]he fact that the ALJ d[oes] not elaborate on this conclusion does not require reversal [where] the record supports h[is] overall conclusion." Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (internal citations omitted).

The introductory paragraph of § 12.05 contains the

following diagnostic description for mental retardation: "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05. The required level of severity for § 12.05 is met when an impairment satisfies the diagnostic description in the introductory paragraph, and any one of the four sets of criteria set forth in paragraphs A, B, C, or D. See 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.00 and 12.05; Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Plaintiff herein focuses exclusively upon the requirements of paragraphs (B) and (C).

To show a sufficiently severe disorder under § 12.05(B), an applicant must show "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(B). To show a sufficiently severe disorder under § 12.05(C), an applicant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P., App. 1, 12.05(C) (emphasis added).

In the case at bar, the record includes Plaintiff's school records which indicate that Plaintiff underwent IQ testing at age 16 and attained verbal and performance IQ scores of 54, and a full-scale IQ score of 50, scores which are within the requirements of § 12.05(B) and (C). In his decision, the ALJ

analyzed Plaintiff's impairments and the evidence of record, including Plaintiff's IQ test (Tr. 14, 46), and concluded that Plaintiff lacked "a valid verbal, performance, or full scale IQ of 59 or less." (Tr. 12). Plaintiff contends that the ALJ was not justified in concluding that he lacked a valid IQ test. Review of the ALJ's decision, however, reveals that he acted within his discretion when he determined that Plaintiff lacked valid IQ test results that met the requirements of § 12.05.

While an IQ test is helpful in determining whether an applicant has a mental impairment, it is not dispositive, and other information illustrating the claimant's ability to function can be used to discredit the results of an IQ test. Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004)(citing Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998)). The Eighth Circuit has emphasized that IQ scores must be valid; that the Commissioner is not required to rely exclusively upon IQ scores; and that the Commissioner may disregard test scores that are inconsistent with a claimant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998); see also Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) (an ALJ is not obligated to accept an IQ score, and should instead examine the record to determine whether the score is reliable - that is, consistent with the claimant's daily activities and behavior); Holland, 153 F.3d at 622 (an ALJ may reject IQ scores that are inconsistent with the record).

Having established that certain circumstances permit an ALJ to discredit an IQ score, the undersigned considers whether such circumstances existed in this case.  The undersigned first notes that the document reporting Plaintiff's IQ test results contains no indicia of validity.  While the record does identify the test administered as the WISC-R, the test itself is not included in the administrative record, nor does the record include a narrative explaining the scores.  Instead, the scores achieved are simply written on a small graph.  The record contains no information, nor does Plaintiff offer any, tending to show that the IQ test was properly administered using accepted techniques, or that it was performed by one qualified to administer such tests or even reviewed by a qualified individual and deemed valid.  See Miles, 374 F.3d at 700 (affirming the ALJ's decision to reject the claimant's school IQ scores where the school records failed to describe the type of IQ test administered and included no narrative explaining the scores).

The balance of the evidence of record not only supports the ALJ's conclusion that Plaintiff's IQ scores were not valid, it supports the ALJ's ultimate conclusion that Plaintiff failed to meet the requirements of § 12.05, inasmuch as there is no evidence that Plaintiff suffered the required deficits in adaptive functioning required by § 12.05, or that there exists "a physical or other mental impairment imposing an additional and significant work-related limitation of function" as required by § 12.05(C). First, while the record does indicate that Plaintiff was referred

-21-

for placement in special education classes while in school, there is no indication that this class placement was made by a qualified mental health professional.   Furthermore, Plaintiff's school records indicate that he spent only half of his week in special education classes, and spent the other half in regular education classes.  (Tr. 120).  It is also indicated that Plaintiff required no modifications to his regular education classes.  (Id.)

Further support for the ALJ's decision is found in Plaintiff's own statements.  When asked by Mr. Keough why he left school in the eleventh grade, Plaintiff did not mention trouble with learning but instead stated that he left school early because his family was always moving around.  (Tr. 188).  Similarly, in explaining on his Disability Report why he stopped working on August 12, 2008 (his alleged onset date) Plaintiff cited no difficulties with performing his duties but instead stated that he had been fired for cashing someone else's check.  (Tr. 139); see Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (claimant stopped working because she was fired for slapping a patient, not because of her disability).  While Plaintiff cites to the fact that he does not have a driver's license, Plaintiff testified that he never attempted to get a driver's license because of his alcohol use.  (Tr. 39).  Furthermore, when Mr. Keough asked Plaintiff what kept him from working a full 40-hour week, Plaintiff did not cite cognitive difficulties, but instead explained that he did not have an up-to-date ID as required by most jobs.  (Tr. 189).  Also, when Mr. Keough asked Plaintiff how he was disabled mentally, Plaintiff

-22-

replied, _inter_ _alia_, that he could not "comprehend," and again later stated that his main problem was "comprehending," (Tr. 188-89), which is somewhat inconsistent with allegations of total disability due to mental retardation.

Plaintiff told Mr. Keough that he was able to manage money, and Mr. Keough noted that Plaintiff was able to give his date of birth and social security number, relate his history in a sequential fashion, and perform adequately on memory testing. (Tr. 189). Mr. Keough noted that Plaintiff had no difficulty interacting with him or following the context of the interview, and that Plaintiff was able to understand and follow simple instructions. (_Id._) Plaintiff told Mr. Keough that he was living with his girlfriend of two years and his son. (Tr. 188).

When Plaintiff was evaluated by the Department of Mental Health, he denied having a problem that interfered with his life or required treatment, and exhibited no trouble with comprehension, concentration, or memory. (Tr. 212, 218). As the ALJ observed, Plaintiff was independent in all aspects of personal care, was able to perform activities of daily living, and had a demonstrated ability to maintain successful relationships with others and develop friendships.

Consistent with all of the foregoing, the ALJ noted that Plaintiff had engaged in substantial gainful activity for a number of years since his IQ test. Indeed, according to Plaintiff's earnings record, he earned $13,120.03 in 2002; $10,719.83 in 2003; and $10,359.60 in 2004. (Tr. 112). As the Commissioner correctly

notes, these amounts were above the substantial gainful activity levels for the years indicated.[2]  The Eighth Circuit has found that working at the substantial gainful activity level is inconsistent with the necessary deficits in adaptive functioning.  See Cheatum v. Astrue, 388 Fed. Appx. 574, 576 n. 3 (8th Cir. 2010).  Furthermore, the record contains no evidence that plaintiff's intellect worsened since his working years.  A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability.  Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

Plaintiff states that the issue in this case is whether he satisfies the requirements of a listing, and not whether he actually can perform his past relevant work, and suggests that, by considering his past work, the ALJ "blurred the two inquiries." (Docket No. 20 at 11).  While consideration of whether a claimant can return to his past work is not a relevant inquiry if he proves that he meets the requirements of a listing, see 20 C.F.R. §§ 404.1520, 416.920, in the case at bar, the ALJ decided at step three that Plaintiff failed to meet or equal a listed impairment, and then continued to step four of the sequential evaluation process and considered Plaintiff's residual functional capacity and his past relevant work, and concluded that he remained able to perform his past relevant work.  (Tr. 14).  The ALJ properly followed the sequential evaluation process in considering

_____

[2]http://www.ssa.gov/OACT/COLA/sga.html (last visited January 26, 2012).

Plaintiff's claims.

In addition, the undersigned notes that the ALJ properly concluded that Plaintiff's statements concerning the limiting effects of his impairments were not entirely credible.[3]  The ALJ noted that Plaintiff's use of marijuana while on probation did not reflect well on his credibility.  Indeed, during his administrative hearing, Plaintiff testified that he had never used marijuana.  There is no indication in the record that Plaintiff had trouble understanding or answering the ALJ's question, and Plaintiff makes no such argument here.  (Tr. 30).  Contrary to his hearing testimony, the record shows that, on November 10, 2008, Plaintiff's probation officer referred him for treatment due to urinalysis results that were positive for marijuana.  (Tr. 209, 211).  In a Department of Mental Health questionnaire, Plaintiff indicated that he had used marijuana for the past 23 years (Tr. 214), and also indicated that he had intentionally used marijuana eight or nine months prior to November 10, 2008.  (Tr. 211).  See Karlix, 457 F.3d at 748 (the ALJ properly found the claimant unreliable because his hearing testimony regarding his alcohol consumption conflicted with medical documentation).  In addition, Mr. Keough noted that Plaintiff appeared to be overemphasizing his symptoms. (Tr. 189); See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003)(An ALJ

_____

[3]Plaintiff does not challenge the ALJ's residual functional capacity assessment or his credibility determination.  However, the undersigned has reviewed the ALJ's decision in light of the record as a whole and concludes that the ALJ applied the correct legal standards to the evidence, and substantial evidence supports his credibility determination and his residual functional capacity assessment.

may discount a claimant's allegations if there is evidence that he is a malingerer or was exaggerating his symptoms).  Substantial evidence supports the ALJ's decision that Plaintiff's allegations were not entirely credible.  The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

Plaintiff contends that, even if it was proper to consider his age 16 IQ testing invalid, "it would be easy to assume the Plaintiff still had mild mental retardation levels" given Mr. Keough's estimate that Plaintiff's IQ was below 70 and that, "[e]ven with mild mental retardation, the Plaintiff would fall within the range specified by listing 12.05(C)."  (Id. at 8). Plaintiff also states that the ALJ disregarded Mr. Keough's estimated IQ range without giving a proper reason for doing so. Plaintiff's contention is meritless.

As the Commissioner correctly notes, the listings require more than mere assumptions, and a claimant may be deemed to meet a listing only if he meets his burden of proving that his impairments meets or equals all of the specified criteria.  McCoy, 648 F.3d at 611 (citing Marciniak, 49 F.3d at 1353).  A claimant will not be deemed to have met a listing merely because he has been diagnosed with a condition named in a listing, and meets some of the criteria.  Id. at 612.  Mr. Keough's guess as to the range Plaintiff's IQ probably falls into is nothing more than speculation, and far from satisfies the requirement of a "valid

-26-

verbal, performance, or full scale IQ" as required by § 12.05 (B) and (C). It cannot be said that the ALJ committed reversible error by not considering Mr. Keough's estimate of Plaintiff's IQ as sufficient to meet the requirements of any of the listings.

Plaintiff also states that the ALJ failed to identify what weight he gave to Mr. Keough's report. The opinions of Mr. Keough and Dr. Altomari are consistent in many respects, not the least of which is the necessity of IQ testing. As indicated above, while Mr. Keough was instructed to perform IQ testing if he deemed it necessary to do so, he chose to not perform IQ testing. This is consistent with Dr. Altomari's observation that IQ testing was unnecessary. According to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), if the medical opinions in the record are inconsistent with each other, the ALJ must weigh all of the evidence. However, if the medical opinions are consistent, this is unnecessary. 20 C.F.R. §§ 404.1527(c)(1) and 416.927(c)(1); see also Hepp v. Astrue, 511 F.3d 798, 806-07 (8th Cir. 2008). The ALJ in this case properly considered all of the evidence of record, and the fact that he did not specify the weight he was giving to Mr. Keough's opinion or elaborate upon his reasons for the weight afforded does not require reversal.

Plaintiff suggests that the ALJ gave great weight to Dr. Altomari's opinion "without applying the factors in 20 C.F.R. §§ 404.1527 and 416.927" including "examining relationship, treatment relationship, supportability, consistency of medical opinion, specialization of medical source and other factors brought to the

-27-

Commissioner's attention bearing upon the weight medical opinion should be accorded." (Docket No. 20 at 7-8). Plaintiff does not, however, attempt to explain how any of the factors he cites support an argument that this Court should reverse and/or remand based upon the weight the ALJ gave to Dr. Altomari's opinion. Having reviewed the ALJ's decision in light of the entire record, the undersigned can find no fault with the ALJ's treatment of Dr. Altomari's opinion. Because Plaintiff never independently obtained any medical or psychological treatment, it cannot be said that the ALJ erroneously gave greater weight to Dr. Altomari's opinion than to that of any treating source. Dr. Altomari's opinion is consistent with the balance of the information of record, and he included a narrative which fully explained the reasons for the opinions given. As for "other factors brought to the Commissioner's attention bearing upon the weight medical opinion should be accorded," (Docket No. 20 at 7-8), it is unclear what Plaintiff is referring to, and Plaintiff makes no attempt to explain.

Plaintiff has failed to meet his burden of demonstrating that he meets the requirements of either § 12.05(B) or § 12.05(C). Section 12.05 does not merely require a certain IQ score; it requires a score that can be considered valid. <u>Maresh</u>, 438 F.3d at 899. In this case, the ALJ properly analyzed the record and acted within his statutory authority in concluding that the record did not contain a valid IQ score that met the threshold requirements of § 12.05 (B) or (C). It is proper for an ALJ to reject IQ scores when, as here, they are inconsistent with the rest of the record.

-28-

<u>Clark</u>, 141 F.3d at 1255; <u>see also</u> <u>Muncy</u>, 247 F.3d at 733 (an ALJ may disregard test scores that are inconsistent with a claimant's demonstrated abilities). In addition, for the reasons explained above, the record does not support the conclusion that Plaintiff has the necessary deficits in adaptive functioning, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05, or that there exists "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C); <u>see also</u> <u>Maresh</u>, 438 F.3d 897, 900 (citing <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir. 2000)).

B.   <u>Fully and Fairly Developed Record</u>

Plaintiff also appears to assert that the ALJ in this case failed to ensure a fully and fairly developed record. It is well-settled that the ALJ is required to ensure a fully and fairly developed record. <u>Nevland v. Apfel</u>, 204 F.3d 853 (8th Cir. 2000)(citing <u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. <u>Id.</u> at 858; <u>see</u> <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071-72 (8th Cir. 2004). An ALJ is also required to re-contact a physician when the ALJ is unable to determine from the record whether the claimant is disabled. <u>Sultan v. Barnhart</u>, 368 F.3d 857, 863 (8th Cir. 2004). The Court's inquiry is whether the plaintiff was prejudiced or treated unfairly by how the ALJ did or did not develop the record. <u>Onstad v. Shalala</u>, 999 F.2d 1232, 1234

-29-

(8th Cir. 1993).   Absent unfairness or prejudice, remand is not
warranted.   Id. (citing Phelan v. Bowen, 846 F.2d 478, 481 (8th
Cir. 1988)).

        Citing to page 47 of the administrative transcript,
Plaintiff argues that his attorney requested updated intelligence
testing, but that no such testing was performed. However, the
record, particularly page 47 of the administrative transcript,
belies Plaintiff's argument that counsel requested updated IQ
testing.   At the conclusion of the testimony, the following
exchange occurred between the ALJ and Plaintiff's attorney:

ALJ:      Anything else, please?

ATTY:     I'm sorry.   I'm just looking for something
          really quick.   No, Your Honor, I don't, I
          don't have any questions of the vocational
          expert, but I am going to again repeat that I
          feel the claimant meets the listings, and I
          also want to bring out that I disagree with
          DDS statement that even though the CE said
          that, that his diagnostic impression, which
          would be at 1F, on the axis II, said that
          there's traits indicative of below 70 IQ, but
          then DDS determined that an IQ test would not
          be helpful even though he'd had previous IQ
          test with IQ scores in the 50s, I, I just do
          not agree at all with their analysis that it
          would be inappropriate to have an IQ test.

ALJ:      So this is your closing argument?

ATTY:     Yes.

ALJ:      Okay.

ATTY:     It is.   If that's okay?

ALJ:      It's fine, as long as we know it's your
          closing argument. Yes sir.

          * * *

-30-

ALJ:        Okay.  Is there anything else please?

ATTY:       Oh No.  Just – –

ALJ:        I appreciate that.

ATTY:       Okay.  So that – –

(Tr. 46-47).

      Based upon the statements of counsel at the page cited by Plaintiff in support of his argument, and based upon review of the hearing in its entirety, it cannot be said that "Plaintiff's counsel requested updated intelligence testing" as Plaintiff asserts.  (Docket No. 20 at 7).  Instead, it appears that the attorney merely expressed disagreement with the opinion of the mental health professional that it was unnecessary to perform an IQ test.  While the ALJ has a duty to develop the record fully and fairly, even when a claimant is represented by counsel, "it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about."  Onstad, 999 F.2d at 1234 (citing Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981)).

      Plaintiff also states that, if the ALJ needed more information, it was his duty to develop the record and request IQ testing.  However, the ALJ noted that Dr. Altomari had opined that IQ testing would not be productive.  As noted above, this is consistent with Mr. Keough's decision to not perform IQ testing even though he was told to do so if he deemed it necessary.  Dr. Altomari's opinion is consistent with Dr. Keough's report and with the balance of the information of record which, as discussed above,

-31-

demonstrates that Plaintiff generally functioned well in his daily life and worked for years at the substantial gainful activity level. Moreover, the instances in Plaintiff's life where it could be said that he did not function well; i.e. lacking a driver's license, leaving school in the eleventh grade, and being fired from his last job, were all explained by Plaintiff as being due to reasons other than his impairments. An ALJ is required to order tests only if the evidence presented to him or her fails to give sufficient evidence to determine whether the claimant is disabled. Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) (citing Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)). The record was sufficiently developed, and the ALJ did not commit reversible error by failing to order an IQ test. See Id. (ALJ did not err in failing to order IQ test where physician opined that IQ test was not warranted and such opinion was supported by the record).

The ALJ in this case fulfilled his duty to ensure a fully and fairly developed record. There is no indication that the ALJ felt unable to make the assessment he did. An ALJ is permitted to issue a decision without obtaining additional evidence as long as other evidence in the record provides a sufficient basis for the ALJ's decision. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). Plaintiff was treated fairly and he has failed to show that he was prejudiced; therefore, remand is unnecessary. See Onstad, 999 F.2d at 1234.

For all of the foregoing reasons, on the claims that

-32-

Plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821.


Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of February, 2012.

–33–